IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No. 3:13 CR 20 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Stanley L. Haythorne, | |
| Defendant. | |

### INTRODUCTION

Defendant Stanley Haythorne filed a Motion to Suppress (Doc. 8), requesting this Court suppress statements he made during a 2009 interrogation by law enforcement officers in Canadian County, Oklahoma. The Government filed an Opposition (Doc. 9). This Court held a hearing on the Motion on June 6, 2013 and heard testimony from the interrogating officer. For the following reasons, Defendant's Motion is granted.

### BACKGROUND

On January 14, 2009, Oklahoma law enforcement stopped a tractor-trailer operated by Defendant and his brother, Franshawn Turner, in Canadian County, Oklahoma, and a subsequent search of the trailer revealed 200 pounds of marijuana. Defendant and his brother were taken into custody and brought in for questioning by investigator Kenneth Park. The entire interview was video recorded.

Park explained his role in the investigation and (15:30–16:41[1]) began discussing Defendant's options for cooperating with authorities (16:41–17:20). In particular, they discussed Defendant completing a "controlled delivery" of the marijuana found in the tractor-trailer under the supervision of the DEA to enable the DEA to further investigate a possible drug conspiracy (16:50–17:20). At this point, Defendant twice mentioned obtaining a lawyer:

| | |
|---|---|
| DEFENDANT: | It defeat the purpose if I'm saying this and that and then I'm still stuck here. It defeat the purpose . . . . |
| PARK: | Sounds to me like you are trying to negotiate the information that you have but you are not negotiating from a position of power |
| DEFENDANT: | I need because . . . I'm trying to negotiate because . . . it's going to be my life on the line. You know what I'm saying? |
| PARK: | We've done this before and we know this but they are going to have to hear what you have to say before they make any decisions. Whether or not your brother goes with you or whether or not . . . I mean . . . who's involved in the deal. I'll tell you what I'll give you the opportunity now that's fair . . . I'm telling you it doesn't go anywhere unless we start hearing the initial story in this room. |
| DEFENDANT: | **I can't go on that. I can't go on like that with my life on the line so I'll just wait until I talk to my lawyer then.** |
| PARK: | I understand. |
| DEFENDANT: | . . . I can't go on like that. I can't say . . . I'm going tell . . |
| PARK: | You realize the delivery can't be done until you tell the story, basically. |
| DEFENDANT: | I understand that . . . but the . . . it ain't that simple, **but I'll go to talk to my lawyer and let him negotiate the deal or however because I can't go on me telling you all this information while I'm stuck in here and you know**. People can touch from wherever and I ain't trying to be sitting in Oklahoma City jail and worrying about that. I would rather be sitting there quietly and I mean, you know what I'm saying? |
| PARK: | Your options in this are you agree to work with us. You tell us your story. |

---

[1]Times approximated.

2

DEFENDANT: I'm agreeing to that but I can't agree to it if it's not . . . we leaving in here. The longer we sitting here the longer – it ain't going to be a good deal.

PARK: I understand that. We understand that and we do this all the time. I'm telling you . . . if you'll hear me out . . . . My kicker, my kicker to this is you think you are negotiating from a position of power whenever actually you're not. Hold on, hear me out, hear me out. I have got to get a story down. I have got to get a story down as to where this stuff is coming from and where it's going now . . . . (17:49–20:12).

Park continued to explain that the DEA was going to require a story from Defendant before it would consider participating in a controlled delivery (20:12–21:26). At that point, Park brought a DEA agent into the interview room (22:20). The DEA agent told Defendant he would need "a story" to complete a controlled delivery in an effort to help Defendant get reduced charges (22:20–23:36). Using hypotheticals, the DEA agent, Park, and Defendant discussed possible benefits of Defendant's cooperation (23:36–27:55).

Eventually, Defendant asked, "where do you start at in something like this?" (27:56). Park responded that he had a series of questions to ask but before he could do so he needed to advise Defendant of his rights (27:56–28:19). At this point, Park read Defendant his Miranda rights (28:20–28:54). Park then asked Defendant, "Having these rights in mind, do you wish to talk to me now?" (28:55). Defendant sat in silence for several seconds before the following conversation ensued:

DEFENDANT: You said if, if talk right now ...

PARK: Stanley, I mean I've got to make this really, really clear because you mentioned, made mention a little while ago that you wanted to talk to an attorney first, which would shut this down so I've got to stop this . . . I need to make this very, very clear.

DEFENDANT: **My thing about the attorney was with . . . they could do all my talking to you guys and I'll tell you all what I know and they can pen out the deal. That was what I was thinking with the attorney because . . .**

3

| | |
|---|---|
| PARK: | **I can't get an attorney here this afternoon and that's going to blow the delivery. I can tell you that there is no way I can get a defense attorney over here for you this afternoon in the amount of time it's taken, so I've got to make this very, very clear I mean I want to make this really clear with you. Having these rights in mind, do you wish to talk to us now without an attorney present?** |
| DEFENDANT: | **How come you couldn't get an attorney here?** |
| PARK: | **Because they're all down at the courthouse. I mean you're going to have to hire one, go through . . .** |
| DEFENDANT: | Okay. |
| PARK: | **. . . go through an entire, you know are you going to pay one or get a court appointed attorney, you're not going to get a hold of that for four or five days at the earliest for a public defender but if you're going to pay one, you're still going to get a fee agreement with him and all sorts of other stuff. So we've . . . I've gotta . . . so I want to make sure you are extremely clear on this, you have the right to a lawyer but if you are willing to talk to me now without a lawyer present, that is up to you.**<br>**[pause]** |
| DEFENDANT: | All right. |
| PARK: | All right? You'll talk to me? (29:20–30:56). |

Defendant then asked to speak to his brother, a request which Park denied (30:56–32:14). Park next re-explained that Defendant had the right to counsel and could stop at any time (32:15–33:00). At this point, Defendant began answering questions from Park and the DEA agent.

### DISCUSSION

Before law enforcement may interrogate a suspect in custody to procure admissible statements, they must first read the suspect *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436 (1966). An "interrogation" comprises "not only [] express questioning, but also any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

4

It is the government's burden to establish a waiver of *Miranda* rights by a preponderance of the evidence. *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009). "A waiver of *Miranda* rights must be voluntary, that is, 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *Id.* (quoting *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000)). That is, "[t]he waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quotation marks and citation omitted). In assessing whether a waiver is "knowing and intelligent," the relevant question "is not whether the criminal suspect knew and understood every possible consequence of a waiver of the Fifth Amendment privilege, but rather whether the suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* (quoting *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (internal quotation marks and alterations omitted)). "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476; *see also Escobedo v. Illinois*, 378 U.S. 478, 481 (1964) (excluding confession where police deceived the suspect by telling him his lawyer "didn't want to see him").

Here, Defendant told Park he wanted a lawyer to speak on his behalf with law enforcement regarding the seized marijuana shipment. In response, Park told Defendant he would not be able to get a lawyer that day, or even for four or five days and that this delay would "blow the delivery" such that law enforcement would no longer be willing to follow up on information Defendant might be able to provide.

In fact, Park had no basis for telling Defendant he could not obtain a lawyer that day or even in four or five days. During the suppression hearing, Park acknowledged his statement -- that all the lawyers were at the courthouse -- was false. Park further testified it is the practice of the state of

5

Oklahoma to arraign individuals within 72 hours of being taken into custody, and therefore, under any scenario, the longest period of time it would take for Defendant to talk to a lawyer was three days, not four or five. And, even though he talked about when *he* could (or could not) get Defendant an attorney, Park is not the individual responsible for procuring and assigning in-custody suspects counsel; Park even acknowledged he was actually precluded from involvement in that process.

The Government argues that investigating drug activity is difficult, and being forthright about a suspect's access to counsel will make investigations more difficult. "The time sensitive nature of drug investigations often requires law enforcement to enlist the timely cooperation of defendants in order to preserve a delivery, secure evidence against co-conspirators, and to help ensure the safety of cooperating defendants" (Doc. 9 at 7–8).

The representation to Defendant that no lawyers were available that day or in the next few days was false and misleading and precluded Defendant from making a "knowing and intelligent" waiver of his Fifth Amendment rights. *See Adams*, 583 F.3d at 467. This representation caused Defendant's waiver to be the "product of . . . coercion or deception," rather than free will. *Id.* Park's representation was deceptive when he told Defendant that all the lawyers were at the courthouse, when he told Defendant it would take more than a day to retain a private lawyer, when he told Defendant that being appointed a public defender would take four or five days, and when he spoke as though appointment of counsel was his responsibility or prerogative.

Park's narrative was also arguably coercive because it was presented to Defendant as a choice: either waive his right to counsel at that moment and cooperate or be forever barred from cooperating. In *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991), the Second Circuit held a confession was coerced where an officer told a suspect he would be permanently precluded from cooperating with police if he asked for a lawyer. In that case, the officer told the defendant three times to choose

6

between having an attorney present during questioning or cooperating with the government. *Id.* The Second Circuit found that such statements were coercive and "false and/or misleading," noting "[i]t is commonplace for defendants who have acquired counsel to meet with federal law enforcement officials and agree to cooperate with the government." *Id.* The court further noted that even if the officer's statements were true -- that the suspect would lose the ability to provide some cooperation by exercising his Fifth Amendment rights because of the time-sensitive nature of executing additional warrants and searches -- the officer's representations "were nevertheless misleading since [defendant] could still provide *other* cooperation at a later date." *Id.* (emphasis in original).

The Government's contention that the difficulty of investigations mandates this Court admit the testimony carries no weight; such reasoning applies to many criminal investigations and adopting a "time is of the essence" exception to allow the Government to selectively disregard constitutional rights would be an affront to Fifth Amendment jurisprudence. Park's misrepresentation deprived Defendant of making a knowing and intelligent waiver of his *Miranda* rights. In assessing whether a waiver is knowing and intelligent, one of the relevant questions is "whether the suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Adams*, 583 F.3d at 467. Park told Defendant he could not cooperate with counsel. The Government's rationale is rejected; the right applies whether the investigation is easy or difficult.

**CONCLUSION**

Defendant's Motion to Suppress (Doc. 8) is granted. The statements made by Defendant during the January 14, 2009 interrogation are excluded from the prosecution of this case.

IT IS SO ORDERED.

                                                       s/ *Jack Zouhary*
                                                      JACK ZOUHARY
                                                      U. S. DISTRICT JUDGE

                                                      June 14, 2013